## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR VENTURE CORP., ASSET CO. FREIGHT BROKERS, INC., SUNSHIP INC., and FREIGHT HUB CORP., <br><br> *Plaintiffs,* <br><br> against <br><br> AGRICULTURAL LOGISTICS LLC, AGRICULTURAL TRANSPORT PAYROLL INC., JACOB SAM, and MATTHEW GORKA, <br> *Defendants.* | Case No. <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Windsor Venture Corp. ("Windsor"), Asset Co. Freight Brokers Inc., Sunship Inc., and Freight Hub Corp. (collectively "Plaintiffs"), by and through their attorneys Lewis & Lin LLC, for their Complaint against Agricultural Logistics LLC ("Agricultural Logistics"), Agricultural Transport Payroll, Inc. ("Agricultural Transport"), Jacob Sam ("Sam"), and Matthew Gorka ("Gorka," collectively with Agricultural Logistics, Agricultural Transport, and Sam, "Defendants"), respectively allege as follows:

### PRELIMINARY STATEMENT

1.      This is an action for recovery of damages and equitable relief arising from acts of breach of contract, unlawful brokerage activity in violation of 49 U.S.C. § 14916, defamation *per se*, unfair competition, false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A), false advertising in violation of 15 U.S.C. § 1125(a)(1)(B), and conspiracy in connection with the Defendants' fraudulent business practices and retaliatory attacks against its own victims. Defendants, after their fraudulent business practices were uncovered, commenced a systematic

attack of retaliatory online harassment and defamation via various review websites relevant in the parties' shared industry, namely Carrier411 and TIA Watchdog.

2.    Agricultural Logistics contracted with Windsor, a trucking company, to deliver three separate loads on behalf of third-party suppliers. Though Windsor completed the deliveries, Agricultural Logistics refused payment to Windsor.

3.    In an attempt to secure payment for the work performed, Windsor contacted a third-party supplier for payment, only to be informed that the supplier had paid the carrier-arm of Agricultural Logistics—Agricultural Transport—for the delivery.

4.    This is a practice known as "double-brokering," wherein a logistics company contracts with a trucking company to deliver a load, only to intercept the supplier payment for the load, retaining the payment via an associated business. In essence, "double-brokering" is a scheme for a middle-man company to intercept a supplier payment for delivery, while not paying the trucking company that actually performed the work.

5.    Windsor confronted Agricultural Logistics about this practice, and rather than pay the owed amount, Agricultural Logistics, acting in concert with Agricultural Transport, and through their agents Mr. Sam, and Mr. Gorka, began a series of retaliatory actions to cover up its own wrongdoing.

6.    In this campaign, Defendants posted, or caused to be posted, the false reviews to publish false and defamatory statements about Windsor, and five other businesses associated with Windsor and its owner, Luis Lopez. As a result of Defendants' misconduct, Plaintiffs have been substantially and irreparably harmed.

7.    Defendants posted defamatory reviews directed at six different organizations, even though they only had contact with Windsor. Further, two of the six organizations were

closed and not in operation. This demonstrates that Defendants made the reviews with knowledge of their falsity and for the sole purpose of damaging Plaintiffs as a tactic in a professional dispute between businesses.

8.     Defendants' reviews have harmed the Plaintiffs' professional reputation, as the reviews were made on websites specific to the logistics and trucking industry for maximum impact on the Plaintiffs' industry-wide perception.

## PARTIES

9.     Plaintiff Windsor Venture Corp. d/b/a Windsor Trucking is a corporation organized and existing under the laws of the State of Delaware.

10.     Plaintiff Asset Co. Freight Brokers, Inc. is a corporation organized and existing under the laws of the State of Florida.

11.     Plaintiff Sunship Inc. is a corporation organized and existing under the laws of the State of Florida.

12.     Plaintiff Freight Hub Corp. is a corporation organized and existing under the laws of the State of Florida.

13.     Upon information and belief, Defendant Agricultural Logistics LLC is a limited liability company organized under the laws of the State of New York with a principal place of business located at 62 Franklin Ave, Dunkirk, NY 14048.

14.     Upon information and belief, Defendant Agricultural Transport Payroll, Inc. is a limited liability company organized under the laws of the State of New York with a principal place of business located at 62 Franklin Ave, Dunkirk, NY 14048.

15.     Upon information and belief, Defendant Jacob Sam is an individual residing in the State of New York, County of Chautauqua at 1896 King Rd, Forestville, NY 14062-9710, and President of Agricultural Logistics LLC and Agricultural Transport Payroll, Inc.

16.     Upon information and belief, Defendant Matthew Gorka is an individual residing in the State of New York, County of Chautauqua at 159 Liberty St, Fredonia, NY 14063-2005, and an employee of Agricultural Logistics LLC.

## JURISDICTION AND VENUE

17.     This action arises under federal statutes 49 U.S.C. § 14916 and 15 U.S.C. § 1125(a)(1) and the laws of the State of New York. This Court has subject matter jurisdiction over this action as to Plaintiffs' federal claims under 28 U.S.C. § 1331.

18.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) as they are so related to the claims within the original jurisdiction of this Court that they form part of the same case and controversy under Article III of the United States Constitution.

19.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiffs and Defendants are completely diverse parties, as Plaintiffs are domiciled in Delaware and Florida, and Defendants are all domiciled in New York, and the matter in controversy exceeds $75,000.

20.     Personal jurisdiction exists over Defendants in this judicial district since the Defendants, as to the entities, all have their principal place of business, and as to the individuals, all reside in this judicial district.

21.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) as all Defendants reside in New York State in this District and a substantial part of the events giving rise to this complaint occurred within this judicial district.

## FACTUAL BACKGROUND TO ALL CLAIMS

22.     Plaintiff Windsor Venture Corp., d/b/a Windsor Trucking is a Florida corporation that provides long-haul freight transportation services, known as over-the-road ("OTR") services.

4

Windsor is an asset-based carrier, meaning Windsor owns the trucks and transport vehicles used to fulfill orders.

23.    In a typical freight order, a supplier of products contacts a trucking broker, also known as a freight broker, to act as a middleman for the transport of goods. The freight broker coordinates communication between shippers and the transport company. Freight brokers do not own trucks; rather freight brokers coordinate with carriers.

24.    Carriers then contract with individual drivers, who are often independent contractors, to actually pick up, drive, and deliver loads needed by suppliers.

25.    An illustration of the typical supplier, broker, and carrier relationship for OTR service is below:



26.    Windsor has been in business for over two years and has an excellent reputation in its industry among brokers, drivers, and other carriers.

27.    Defendant Agricultural Logistics is a freight broker for OTR services, based out of Dunkirk, New York.

28.    Defendant Agricultural Transport is an asset-based carrier company, based out of the same office in Dunkirk, New York.

29.    It is not uncommon for two organizations, one freight broker and one asset-based carrier, to be closely linked and to handle both broker and carrier services in tandem.

30.     Upon information and belief, Agricultural Logistics and Agricultural Transport, while two separate entities, operate in tandem under the name "AG Team" and market themselves as one organization with two separate arms.

### *Agricultural Logistics' Failure to Pay for Services Rendered*

31.     Agricultural Logistics contracted with Windsor to perform three different OTR loads beginning in April of 2024.

32.     Specifically, on April 1, 2024, Agricultural Logistics obtained Windsor's services for a load from West Seneca, NY to Mount Juliet, TN, or Load Number 5587263 (the "April Order").

33.     Next, on May 16, 2024, Agricultural Logistics again contracted with Windsor to deliver a load from Charlotte, NC to Frederick, MD, or Load Number 5588860 (the "May Order").

34.     Finally, on June 5, 2024, Agricultural Logistics contracted with Windsor to deliver a load from Dothan, AL to Tully, NY, or Load Number 5589856 (the "June Order").

35.     The April Order, May Order, and June Order (or collectively the "Orders"), all had a payment due date of 30 days from the date of invoice and stated that payment is accepted via bank wire.

36.     The Orders constituted valid service contracts, and Windsor performed all services and obligations under these contracts.

37.     To date, Agricultural Logistics has failed to render payment for any order prior to the due date of any Order.

38.     After Agricultural Logistics contracted for the June Order, Windsor's accounting department noted the past due invoice for the April Order, and the lack of payment for the May

Order. On June 5, 2024, Windsor informed Agricultural Logistics of the same, and that payment for all open invoices needed to be paid timely.

39.     On June 6, 2024, Defendant Matthew Gorka assured Windsor that the April Order would be paid as soon as possible, and the other outstanding invoices would be paid prior to their due dates.

40.     Pursuant to this, on June 6, 2024, Agricultural Logistics then forwarded an electronic check in the amount of $1,240.

41.     This payment was deficient on two counts: first, it was $340 less than the invoiced amount of $1,580, and second, was not in a form of payment accepted by Windsor, as stated in the terms on the invoice.

42.     After being informed of the same, Mr. Gorka stated that he would correct and remit payment via wire transfer.

43.     Neither Mr. Gorka nor Agricultural Logistics fulfilled this assurance. At the time of filing Windsor has never received payment for any Orders. Subject to the terms of the Orders, a 1.5% late fee is also imposed, for a total amount of unpaid invoices to $6,164.10.

### *Fulfillment of the June Order*

44.     While Windsor and Agricultural Logistics discussed payment of the outstanding invoices, Windsor's contracted driver continued to fulfill the June Order.

45.     The driver contracted by Windsor to deliver the load was Mr. Jose Lizardo.

46.     On June 5, 2024, Mr. Lizardo picked up load detailed in the June Order in Dothan, Alabama, and began the trip to Tully, New York.

47.     Throughout the trip, representatives from Agricultural Logistics would call Mr. Lizardo directly. This is unusual for an OTR service trip, as it is typically the carrier company—not the freight broker—who relays messages to their driver.

48.     On June 7, 2024, Mr. Lizardo planned to deliver the load to the address provided on the June Order. However, on the day of delivery, Mr. Lizardo received a call from Agricultural Logistics, instructing him to deliver the goods to a new address. This new address was approximately ten minutes in driving distance from the original address.

49.     Mr. Lizardo delivered to the new address as instructed by Agricultural Logistics, and Agricultural Logistics received a delivery confirmation of the load.

### *Discovery of AG Team's Fraud*

50.     While Windsor was seeking payment from Agricultural Logistics, and while Agricultural Logistics was contacting the driver of the June Order directly, Windsor began investigating Agricultural Logistics' business practices.

51.     Windsor contacted the supplier of the June Order, Nutcracker Brands, Inc. in Dothan, Alabama (the "Supplier") to confirm the legitimacy of the June Order.

52.     As explained *supra*, carriers normally do not have contact with suppliers, rather all communications are routed through the freight broker. However, given Agricultural Logistics' non-payment, as well as their unusual business practices, such as calling the driver directly and rerouting the load at the last minute, Windsor sought verification of the Supplier and payment.

53.     The Supplier informed Windsor that payment was given to Agricultural Logistics for the load, and that the load was reportedly being carried by Defendant Agricultural Transport.

54.     As stated, Agricultural Transport, like Windsor, is an asset-based carrier. However, Agricultural Transport is closely associated with Agricultural Logistics, and the two companies are known together as "Team AG".

55.     Upon information and belief, Agricultural Logistics contracted with Nutcracker Brands, Inc. and fraudulently claimed Agricultural Transport was the carrier of the load.

56.     Upon information and belief, Agricultural Logistics never intended to pay Windsor for services rendered and instead retained the payment for the load.

57.     Upon information and belief, Agricultural Transport and Agricultural Logistics were "double-brokering" the load from the Supplier, meaning they contracted with Windsor to actually perform the work while claiming Agricultural Transport carried the load. This allows Agricultural Logistics and Agricultural Transport to retain the Supplier's payment without the expense of actually performing the work.

### *Agricultural Logistics' Retaliatory Attacks*

58.     Once Windsor uncovered Agricultural Logistics' scheme, Agricultural Logistics began a series of retaliatory defensive attacks against Windsor.

59.     After Agricultural Logistics assured that proper payment would be forwarded to Windsor, *supra* Paragraph 42, Defendant Matthew Gorka, acting on behalf of Agricultural Logistics, instead responded with an accusation that Windsor had improperly cashed the electronic checks.

60.     On June 6, 2024, Gorka contacted Windsor claiming that after being informed again that electronic checks were not accepted by Windsor, Agricultural Logistics tried to stop payment on the improperly issued check. Defendant Gorka further claimed that he had found the checks had been cashed at a gas station.

61.     That same day, Gorka then stated that he had contacted the Miami Police Department and filed a theft police report, stating that "we have a potential suspect and are working through the Miami PD to bring justice to this situation."

62.     In response to Gorka's message, Windsor requested the name of the officer handling the investigation and the case number. As the intended recipient of the electronic check, Windsor intended to give a witness statement to the investigator pursuant to a separate investigation.

63.     Gorka refused to provide any information about the alleged investigation, including the officer's name or the case number.

64.     Based on Agricultural Logistics' refusal to pay the open invoices, the "attempted" payment via improper means (i.e. the electronic check), the subsequent unsubstantiated report of the "theft" of the payment, and the refusal to provide any corroboration of a police investigation, upon information and belief, Agricultural Logistics, by and through its agent Gorka, fabricated the payment theft in a further attempt to avoid paying for the loads it fraudulently double brokered.

65.     Upon information and belief, all Defendants also created a fabricated police report to lend credence to the defamatory and false reviews it planned to publish to the professional community of Windsor, and associated businesses.

### *Defendants' Defamatory Reviews*

66.     Defendants Agricultural Logistics and Gorka refused to pay Windsor for services rendered, fraudulently claimed that Windsor stole a check payment meant for services Windsor performed, and falsely stated they had filed a police report but refused to give the officer's name, number, or case report on Friday, June 7, 2024.

67.     The following Monday, June 10, 2024, all Defendants began working in tandem to publish false and defamatory statements about not only Windsor but entities completely unrelated to the parties' initial dispute on industry forums, Carrier411 and TIA Watchdog.

68.     In total, Defendants, working collaboratively, posted eleven reviews of and concerning Plaintiffs and affiliates.

69.     Carrier411, accessible at < https://www.carrier411.com/> is a "carrier monitoring service" that brands itself as "the industry-standard ultimate big data platform for brokers, shippers, factoring companies, and other qualified logistics industry professionals."

70.     Carrier411 is a membership-based review site, that allows users to submit reviews on industry professionals for the purposes of evaluating carrier services. These reports are called a "Freightguard Report" or an "FG report" for short.

71.     TIA Watchdog is a similar membership-based service where trucking industry professionals can post reviews regarding carriers. As stated on their site, available at <https://tiawatchdog.com/>, "TIA Watchdog is a service provided for members to report information about problems to each other in order to help individuals make informed decisions when selecting companies with whom to work."

72.     Beginning on Monday, June 10, 2024, and continuing throughout the week to Friday, June 14, 2024, Defendants Gorka and Sam began publishing the defamatory statements on industry review sites Carrier411 and TIA Watchdog.

73.     The first review was posted on June 10, 2024 at 8:57 p.m. to Carrier411 by a "Matt Gorka of Agricultural Logistics LLC," (the "June 10 Windsor Review") reporting Windsor for a variety of unethical practices, namely (1) no show and no call, (2) held load

11

hostage, (3) theft or unjustified loss of freight, (4) repeated pickup or delivery service failures, (5) fraudulent activity, and (5) unethical or deceptive business practices.

74.     The June 10 Windsor Review also contained additional comments, which stated:

Driver picked up our load and carrier has become non-responsive. Load was scheduled to deliver 6/7 but never arrived. Carrier owner Luis Lopez is hiding behind Gmail accounts, family members and false identities. Any attempts at communication have been met with mockery and harassment. Luis and his affiliates are also under investigation for theft of EFS check services.

75.     This review is false and defamatory, and Agricultural Logistics knew of these statements' falsity when the review was posted.

76.     The June Order was picked up on June 5, 2024 and dropped off on June 7, 2024 by Mr. Lizardo. Agricultural Logistics received a confirmation of the same, and *was in constant contact with Mr. Lizardo*. There was no "no show and no call," "load held hostage," "theft," or "repeated pickup and delivery service failures".

77.     Further, there is no "fraudulent activity" or "unethical or deceptive business practices" being performed by Windsor. There is no evidence of fraud on Windsor's part, nor of deceptive business practices.

78.     Agricultural Logistics' statements that Windsor was "unresponsive" or that the June Order "never arrived" are demonstrably false given that both Windsor and the driver Mr. Lizardo were in constant contact with Agricultural Logistics concerning the June Order.

79.     The attacks on Windsor's owner Luis Lopez are similarly unjustified. The reports that he is "hiding" behind emails and family members is a distortion of the business relationship and communications between the companies, done so with the intent of harming Windsor's and Mr. Lopez's reputations.

80.     Finally, the statement that "Luis and his affiliates are also under investigation for theft of EFS check services" is also false, or at a minimum overblown and unsubstantiated. As recited above, reports of an investigation by any police force have not been confirmed, nor have Defendants forwarded any information that can substantiate the investigation. Neither Mr. Lopez nor Windsor have been informed of any police investigation into them.

81.     Agricultural Logistics' statements made in the first review on June 10, 2024, are knowingly false, and made with the intent of harming Windsor's professional reputation.

82.     After the June 10 Windsor Review, all Defendants embarked on a campaign to further publish defamatory material, and began posting the same review on not only Windsor's page, but other businesses associated with Windsor's owner, Luis Lopez.

83.     The second review was posted on June 12, 2024 at 9:12 p.m. to Carrier411 , again from Matt Gorka of Agricultural Logistics, LLC (the "June 12 Windsor Review"). This review reported that Windsor "held load hostage," unilaterally effected an "in-transit agreement modification," perpetrated "theft or unjustified loss of freight," committed "repeated pickup or delivery service failures," engaged in "fraudulent activity," and committed "unethical or deceptive business practices."

84.     In addition to these false charges, Agricultural Logistics included additional comments comprising of a paragraph of defamatory statements, that it would go on to repeat in every successive review. The comments to the June 12 Windsor Review state:

> Windsor Venture LLC dba Windsor Trucking and owner Luis Lopez are under investigation for felony theft of an electronic check as well as holding a load hostage with the intent to sell. Mr Lopez has multiple MC#'s [1] involved in a fraudulent scheme to hold

---

[1] "MC#'s" as referenced in the review stands for "Motor Carrier" number. This is a unique identifying number issued by the Federal Motor Carrier Safety Administration and, in this case, are assigned to trucks that perform OTR services. This abbreviation is known in the industry and those who read the review would understand its meaning as described above.

13

loads & containers from the port hostage for additional pay, swap companies when they
get FG report…recorded calls & communication available for evidence.

85.     As with the June 10 Windsor Review, Agricultural Logistics' reports in the June

12 Windsor Review of "held load hostage," "in-transit agreement modification," "theft,"

"repeated pickup or delivery service failures," "fraudulent activity," and "unethical or deceptive

business practices" are all demonstrably false and all made with knowledge of their falsity. *See*

*supra* ¶¶ 75-81.

86.     The additional comments of the June 12 Windsor Review contain the same kind

of false and defamatory statements as the first, falsely claiming Windsor and its owner are

"under investigation for felony theft," and "holding a load hostage with the intent to sell." These

claims are similarly false. *See supra* ¶¶ 79-80.

87.     The statement "Mr. Lopez has multiple MC#'s involved in a fraudulent scheme to

hold loads & containers from the port hostage for additional pay, swap companies when they get

an FG report," is also demonstrably false.

88.     Not only has there been no indication of any fraudulent scheme on behalf of

Windsor, the defamatory review claims that there is a "scheme" with multiple orders being held

hostage. Windsor successfully completed the April and May Orders without incident, and the

June Order was completed. Any claim that Agricultural Logistics has uncovered a "scheme" is

false and an offensive attack on Windsor and its owner.

89.     The June 12 Windsor Review includes the statement "recorded calls &

communication available for evidence." But no communications can substantiate Agricultural

Logistics' claim. The inclusion of this statement is to give the defamatory statements credence to

the reader, and further demonstrates Defendants' intent to harm Windsor in its professional

community.

90.     After the June 12 Windsor Review, the same paragraph of defamatory text would be published, not only regarding Windsor, but *five more businesses*, that had some association with Windsor's owner, Luis Lopez.

91.     Defendants Agricultural Logistics and Defendant Gorka, not satisfied with defaming Windsor alone, published the statements to the review pages of businesses completely unrelated and who did not participate in the fulfillment of the Orders.

92.     The third review was posted on Wednesday, June 12, 2024, at 9:15 p.m. again on Carrier 411 by "Matt Gorka of Agricultural Logistics LLC" (the "June 12 Freight Hub Review"). The Freight Hub Review contained the same statements as the June 12 Windsor Review, but was posted regarding another company operated by Mr. Lopez, Plaintiff Freight Hub Corp.

93.     The fourth review was posted on Wednesday, June 12, 2024, at 9:15 p.m. on Carrier411 by "Matt Gorka of Agricultural Logistics LLC" (the "June 12 Team DGD Review"). This review was posted to the page of Team DGD Inc., a *closed* company previously operated by Mr. Lopez. Again, the same defamatory statements from the June 12 Windsor Review and the Freight Hub Review were published on this page.

94.     The fifth review was posted on Wednesday, June 12, 2024, at 9:17 p.m., on Carrier411 by Defendant Matt Gorka of Agricultural Logistics, LLC (the "June 12 Sunship Review"). This review was posted to the page of Plaintiff Sunship, Inc., another company owned by Mr. Lopez and completely unrelated to the instant dispute. The Sunship Review was the same defamatory review as June 12 Windsor Review.

95.     The sixth review was posted on Wednesday, June 12, 2024, at 10:00 p.m. to Carrier 411 by Gorka on behalf of Defendant Agricultural Logistics, this time reporting Plaintiff

15

Assetco Freight Brokers, Inc., another unrelated company (the "June 12 Assetco Review"). This review again repeated the same defamatory statements as the others posted on June 12.

96.     In total, Defendant Gorka working on behalf of Defendant Agricultural Logistics posted six defamatory reviews "reporting" Plaintiffs Windsor, Freight Hub Corp., Sunship, Inc., and Assetco Freight Brokers Inc. to Carrier411.

97.     Still not satisfied with the unjustifiable damage done by these defamatory reviews, Defendants began distributing the statements to another industry review site, TIA Watchdog. These reviews contain the same paragraph of the second defamatory review. *See supra* ¶¶ 83-84.

98.     On Thursday, June 13, 2024 at 1:10 p.m. Defendant Jacob Sam posted a defamatory review to Windsor's company profile on TIA Watchdog (the "June 13 Windsor Review").

99.     Defendant Sam, that same hour, went on to post the same defamatory review to Plaintiff Freight Hub Corp.'s company profile on TIA Watchdog (the "June 13 Freight Hub Review").

100.    On Friday, June 14, 2024 at 3:22 a.m., Defendant Sam posted the same defamatory review to Plaintiff Sunship, Inc.'s company profile on TIA Watchdog. (the "June 14 Sunship Review").

101.    An hour later, Defendant Sam posted the defamatory review *again* to Plaintiff Assetco Freight Broker, Inc.'s company profile on TIA Watchdog (the "June 14 Assetco Review").

16

102.    The final review was posted on Friday, June 14, 2024, at 4:53 a.m., by Defendant

Sam to LTL Hub Corp., another closed company previously owned by Mr. Lopez, again on TIA

Watchdog (the "June 14 LTL Hub Review").

103.    Defendant Gorka and Defendant Sam, both working on behalf of Defendant

Agricultural Logistics, posted eleven defamatory reviews (the "Defamatory Reviews"), ten

containing the same defamatory language, to Plaintiffs' company profiles on two different report

sites, and reported two organizations that were no longer in business.

104.    Defendants Gorka and Sam, again working on behalf of Defendant Agricultural

Logistics, published these statements that are knowingly and materially false and made to

defame Windsor, as well as Plaintiffs Freight Hub Corp., Sunship, Inc., and Assetco Freight

Brokers, Inc.

105.    Defendants Gorka and Sam, working on behalf of Defendant Agricultural

Logistics, directed the Defamatory Reviews to be disseminated in such a fashion that a

reasonable person would believe these reviews were made by persons with first-hand knowledge

of Plaintiffs business, and that the statements were based on an honest evaluation of Plaintiffs'

services.

106.    While the Defamatory Reviews reference "Windsor Venture LLC", a successor of

Windsor Venture Corp., by identifying the trade name "Windsor Trucking" in the review, a

reasonable person would recognize these reviews as of and concerning Windsor.

107.    Upon information and belief, Defendants Gorka, Sam, and Agricultural Logistics,

published the Defamatory Reviews for the sole purpose of harming Plaintiffs' reputations and

causing these organizations to lose revenue, as all of the statements bear directly on Plaintiffs'

services, professional capabilities, all key aspects of Plaintiffs' businesses. The reviews all state

that Plaintiffs are being investigated for felony charges, another *per se* defamatory statement.

### *Individual Defendants' Tortious Actions were in furtherance of Corporate Defendants*

108.   Defendants Gorka and Sam were acting under the scope of their employment with

Agricultural Logistics and Agricultural Transport when the above tortious acts were committed.

109.   Defendant Gorka is a "certified broker" employed by Agricultural Logistics.

Defendant Gorka coordinates trucking services between suppliers and asset carriers.

110.   Defendant Gorka was acting within his scope of employment when he obtained

the services of Windsor for the April, May, and June Orders, and was acting within the scope of

his employment when he double-brokered the June Order.

111.   Defendant Gorka and Sam were also working in furtherance of Agricultural

Logistics and Agricultural Transport when they posted the Defamatory Reviews.

112.   Upon information and belief, these Defamatory Reviews were made to

preemptively discredit Windsor's allegations of double-brokering and unethical business

practices. The Defamatory Reviews were done to protect and further the interests of Agricultural

Logistics and Agricultural Transport.

113.   Defendants Gorka and Sam further identified themselves as representatives of

Agricultural Logistics in making the reviews, further demonstrating these Defamatory Reviews

were made within the scope of Defendant Gorka and Sam's employment and in furtherance of

that employment.

114.   These tortious actions were done in furtherance of Agricultural Logistics'

business, namely freight brokering, and fell within the direction and control of the employer.

115.    Defendants had express and/or implied authority of Agricultural Logistics and Agricultural Transport, and these tortious actions were in execution of the company's orders, and/or part of the work assigned by the employer.

116.    These tortious acts committed by Defendants Gorka and Sam were so closely connected with the duties owed to the employers Agricultural Logistics and Agricultural Transport that the actions were methods of carrying out the objectives of employment.

## FIRST CAUSE OF ACTION
### (Breach of Contract as to Agricultural Logistics)

117.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

118.    Three valid and enforceable contracts existed between Agricultural Logistics and Windsor, wherein Agricultural Logistics would pay Windsor to perform OTR services and deliver goods between suppliers and retailers.

119.    Agricultural Logistics and Windsor entered into three separate agreements, the April Order, the May Order, and the June Order (the "Agreements").

120.    Windsor fully and properly performed all of its obligations under the Agreements, except as excused and/or waived by Agricultural Logistics actions.

121.    Agricultural Logistics materially breached the Agreements by failing to tender the required payment within the parameters of the Agreements.

122.    As a direct result of the material breaches of the Agreements by Agricultural Logistics, Windsor was forced to incur, will incur, damages, expenses, and costs to cover the costs of the trips and orders it fulfilled.

123.     By reason of the foregoing, Windsor is entitled to recover from Agricultural Logistics compensatory damages of at least $6,164.10, plus applicable interest thereon, plus reasonable attorneys' fees, costs, and disbursements.

**SECOND CAUSE OF ACTION**
**(Unlawful Brokerage Activities under 49 U.S.C. § 14916(a) against all Defendants)**

124.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

125.     Agricultural Logistics retained Windsor for the June Order as an asset carrier. Agricultural Logistics did not remit payment for the June Order to Windsor even though the load was delivered.

126.     Upon information and belief, the Supplier for the June Order did remit payment to Agricultural Logistics for the services performed by Windsor in the June Order, i.e. the transportation of goods from Dothan, Alabama to Tully, New York.

127.     Upon information and belief, the Supplier paid Agricultural Transport after being informed by Agricultural Logistics that Agricultural Transport, not Windsor, performed the services for the June Order.

128.     Upon information and belief, Agricultural Logistics booked the June Order with the intent to divert funds from Windsor using its entity Agricultural Transport to intercept payment meant for Windsor.

129.     This scheme is known as "double brokering."

130.     Upon information and belief, Matthew Gorka was the broker who handled the June Order, orchestrated the double brokering scheme in his role as a middleman between the Supplier and Windsor.

20

131.    Matthew Gorka performed these actions intentionally and while he was acting as an agent of Agricultural Logistics.

132.    Upon information and belief, Jacob Sam as the President of Agricultural Logistics and Agricultural Transport, controlled and directed Mr. Gorka and the Agricultural entities in this scheme.

133.    Upon information and belief Mr. Sam, as the President of Agricultural Transport, authorized and permitted the double brokering scheme directing his organization, to accept payment for services that were never rendered.

134.    Agricultural Logistics, by and through its agent Matthew Gorka, exceeded its operational authority by brokering a load to Windsor while misrepresenting the brokerage to Windsor and the Supplier.

135.    This violation was done with the consent and cooperation of Agricultural Transport, by and through its agent Jacob Sam, as it accepted diverted funds from the Supplier.

136.    All Defendants knowingly authorized, consented to, or permitted Agricultural Logistics to operate a broker without being in compliance with the registration and bonding requirements of 49 U.S.C. §§ 14916(a)(1)-(2).

137.    Further, as an officer, director, and/or principal of both Agricultural Transport and Agricultural Logistics, Jacob Sam is liable for all valid claims incurred.

138.    Defendants' actions as described above have been willful and intentional.

139.    Windsor has been and continues to be damaged by Defendants' unlawful brokering activities.

140.    Accordingly, Windsor is entitled to recover from Defendants a sum to be determined at trial, but expected to exceed $7,000, plus applicable interest thereon, punitive

damages in the sum of at least $200,000, and reasonable attorneys' fees, costs, and disbursements.

### THIRD CAUSE OF ACTION
**(False Designation of Origin ["Reverse Passing Off"] under 15 U.S.C. § 1125(a)(1)(A)
as to Agricultural Logistics and Agricultural Transport)**

141.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

142.   Windsor provides OTR asset-carrier services under the trade name "Windsor Trucking."

143.   Upon information and belief, for the June Order, Agricultural Logistics represented to the Supplier that the entity transporting goods was Agricultural Transport.

144.   Upon information and belief, Agricultural Transport was aware that Agricultural Logistics represented that it had performed services for the Supplier, as Agricultural Transport accepted payment for a service it never performed.

145.   Windsor, not Agricultural Transport, performed the services for the Supplier.

146.   Agricultural Logistics and Agricultural Transport's representation to the Supplier that Agricultural Transport performed the June Order is false and misleading and thereby constitutes confusion, mistake, or deception as to the origin or sponsorship of Windsor's services.

147.   Windsor did not know nor consent to Agricultural Logistics' and Agricultural Transport's representations to the Supplier.

148.   Agricultural Logistics' and Agricultural Transport's actions as described above have been willful and intentional.

149.     Windsor has been and continues to be damaged by Agricultural Logistics' and Agricultural Transport's misrepresentations as described above.

150.     Agricultural Logistics' and Agricultural Transport's false designation constitutes a violation of 15 U.S.C. § 1125(a)(1)(B).

### FOURTH CAUSE OF ACTION
**(False Advertising [Misrepresentation] in violation of 15 U.S.C. § 1125(a)(1)(B) as to Matthew Gorka, Jacob Sam, and Agricultural Logistics)**

151.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

152.     The Defamatory Reviews posted by Defendants Gorka, Sam, and Agricultural Logistics were of and concerning the services and practices of all Plaintiffs.

153.     The Defamatory Reviews labeled the practices of all Plaintiffs unethical business practices, of perpetuating a "fraudulent scheme," accused Plaintiffs of holding freight hostage, and that Plaintiffs', owner Mr. Lopez was under a felony investigation.

154.     All of these statements are false and not correct representation of the nature, characteristics, and/or qualities of Plaintiffs' commercial activities.

155.     Through their Defamatory Reviews, Defendants Gorka, Sam, and Agricultural Logistics have misrepresented the nature, characteristics, and qualities of Plaintiffs' services and/or commercial activities.

156.     As a proximate result of Defendants Gorka, Sam, and Agricultural Logistics actions, Plaintiffs have suffered and will continue to suffer damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Defamation *Per Se* as to all Defendants)

157.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

158.    Agricultural Logistics, by and through its agents Matthew Gorka and Jacob Sam, working individually or in concert, have intentionally made knowingly false statements of fact about Plaintiffs via the Defamatory Reviews.

159.    These statements were made maliciously and willfully and were intended to cause harm to all Plaintiffs' business and reputation.

160.    The aforementioned statements were false when made, Plaintiffs have not engaged in fraudulent or unethical business practices, nor have they stolen anything from Agricultural Logistics, held any load hostage, or performed the laundry list of improper actions as stated by Agricultural Logistics, Mr. Gorka, and Mr. Sam.

161.    The Defamatory Reviews were made of and concerning all Plaintiffs, and were so understood by those who read the publication of them.

162.    The statements made by Agricultural Logistics, by and through Matthew Gorka and Jacob Sam tend to injure Plaintiffs in their business trade and/or profession, as well as accuse Windsor and associated businesses of committing serious criminal acts.

163.    These statements were false and published to third parties in New York, the United States, and across the Internet.

164.    As a result of these Defendants' actions, Plaintiffs have suffered irreparable damage to their reputations, and further damages in the form of lost customer relationships, including those with other freight brokers, suppliers, and independently contracted drivers.

165.     Defendant Jacob Sam also made these statements in furtherance of Agricultural Transport, in an attempt to discredit Windsor after Agricultural Transport's unethical business practices were uncovered.

166.     As a result of the willful and malicious nature of the defamation, as well as the amplification of the defamation by reporting four separate businesses, Plaintiffs are entitled to punitive damages in an amount of no less than $400,000.

**SIXTH CAUSE OF ACTION**
**(Unfair Competition as to Agricultural Transport)**

167.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

168.     Windsor and Defendant Agricultural Transport are in the same industry performing the same services, i.e. asset-based carrier services for OTR shipments.

169.     Agricultural Transport, without performing any actual services, represented to suppliers that it had performed OTR services actually performed by Windsor.

170.     Based on this misrepresentation, Agricultural Transport was tendered payment that was intended for Windsor.

171.     Agricultural Transport receives the benefit of the bargain for the work it did not perform and thus acted unfairly in the shared industry to receive an unfair advantage and benefit.

172.     These actions by Agricultural Transport are outside the morals of the marketplace.

173.     Agricultural Transport undertook these actions with bad faith, as demonstrated by the fraudulent scheme perpetrated by all Defendants in tandem for the benefit of Agricultural Transport.

174.    As a result of Agricultural Transport's actions, Plaintiffs are entitled to punitive damages in an amount of no less than $50,000.

## SEVENTH CAUSE OF ACTION
### (Civil Conspiracy to Commit Defamation *Per Se*)

175.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 116.

176.    As described, *supra* Paragraphs 157 and 166, all Defendants participated in the drafting and publication of the Defamatory Reviews

177.    Agricultural Logistics and Agricultural Transport, by and through their respective agents Matthew Gorka and Jacob Sam, had an agreement between parties to perpetuate the tortious actions that constituted defamation *per se*.

178.    Agricultural Logistics, by and through its agent Matthew Gorka, undertook overt acts in furtherance of this agreement, namely publishing or causing to be published six reviews containing defamatory statements.

179.    Upon information and belief, Agricultural Logistics, by and through its agent Matthew Gorka, drafted, and published or caused to be published the June 10 Windsor Review, June 12 Windsor Review, June 12 Freight Hub Review, June 12 Sunship Review, June 12 Assetco Review, and the Team DGD Review.

180.    Agricultural Transport, by and through its agent Jacob Sam, undertook other overt acts in furtherance of this agreement, namely publishing or causing to be published five reviews containing defamatory statements.

181.    Upon information and belief, Agricultural Transport, by and through its agent Jacob Sam, drafted, and published, or caused to be published the June 13 Windsor Review, the

June 13 Freight Hub Review, June 14 Sunship Review, June 14 Assetco Review, and the LTL Hub Review.

182.    Agricultural Logistics and Agricultural Transport's actions as described above have been willful and intentional.

183.    The coordination of these efforts is evident, as ten of the eleven posted reviews share the exact same language.

184.    Plaintiffs have been and continues to be damaged by all Defendants' actions as described above.

185.    An award of damages for civil conspiracy of a sum to be determined at trial, but Plaintiffs are entitled to punitive damages in an amount of no less than $500,000.

## PRAYER FOR RELIEF

186.    Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

WHEREFORE, Plaintiffs pray for judgment against Defendants awarding Plaintiffs:

  i.      Exemplary or punitive damages in an amount appropriate to punish Defendants and to make an example of Defendants to the community;

  ii.     A permanent injunction enjoining and restraining Defendants and their respective agents, servants, employees, successors, and assigns, and all other persona acting in concert with or in conspiracy with or affiliated with Defendants from disparaging or otherwise posting defamatory comments about any of the Plaintiffs or any of Mr. Lopez's former businesses;

  iii.    an Order directing Defendants to undertake such remedial efforts as the Court deems necessary to restore Plaintiffs' reputations;

511dd0587bff4243

iv.        An award of damages in a sum to be determined at trial, but compensatory damages of at least $6,164.10, plus applicable interest thereon;

v.        An award of damages for violation of 49 U.S.C. § 14916 of a sum to be determined at trial, but not less than $7,000, plus applicable interest thereon, punitive damages in the sum of at least $200,000;

vi.        An award of damages for a violation of 15 U.S.C. § 1125(a)(1)(A) and (B) of a sum to be determined at trial, but in an amount under 15 U.S.C. § 1117(a) for Defendants' profits, any damages sustained by Plaintiffs, and the costs of the action.

vii.        An award of damages for defamation *per se* of a sum to be determined at trial, but Plaintiffs are entitled to punitive damages in an amount of no less than $400,000, and an order directing Defendants and their respective agents, servants, employees, successors, and assigns, and all other persons acting in concert will or in conspiracy with or affiliated with Defendants to remove, delete, or otherwise disable such posts;

viii.        An award of damages for unfair competition of a sum to be determined at trial, but Plaintiffs are entitled to punitive damages in an amount of no less than $50,000;

ix.        An award of damages for civil conspiracy of a sum to be determined at trial, but Plaintiffs are entitled to punitive damages in an amount of no less than $500,000;

x.        Attorneys' fees and costs as permitted by law; and

xi.     Such other relief as the Court deems just and equitable under the

circumstances.


Dated: Brooklyn, New York
       July 23, 2024

                                        Respectfully Submitted,

                                        */s/ David D. Lin*
                                        David D. Lin, Esq.
                                        Rachel Ann Niedzwiadek, Esq. (*pro hac
                                        vice* application forthcoming)
                                        **LEWIS & LIN, LLC**
                                        77 Sands Street, 6th Floor
                                        Brooklyn, NY 11201
                                        david@iLawco.com
                                        rachelann@iLawco.com
                                        Tel: (718) 243-9323
                                        Fax: (718) 243-9326

                                        *Attorneys for Plaintiffs*