UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WINDSOR VENTURE CORP., ASSET CO. FREIGHT BROKERS, INC., SUNSHIP INC., and FREIGHT HUB CORP., <br><br> Plaintiffs, <br><br> v. <br><br> AGRICULTURAL LOGISTICS LLC, AGRICULTURAL TRANSPORT PAYROLL INC., JACOB SAM, and MATTHEW GORKA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:24-cv-688-GWC |

**ORDER ON PARTIAL MOTION TO DISMISS**
**(Doc. 11)**

This lawsuit arises out of three commercial transactions between Plaintiff Windsor Venture Corp. ("Windsor") and Defendant Agricultural Logistics ("AL"). Windsor alleges that AL failed to make payment on those three contracts and, when confronted by Windsor about the nonpayment, retaliated by posting disparaging online reviews of Windsor and the other plaintiffs (all companies owned, like Windsor, by Luis Lopez). Plaintiffs allege that the other defendants participated in this online attack campaign.

The Complaint brings seven claims. Currently pending is Defendants' Partial Motion to Dismiss four of those claims. (Doc. 11.) The parties have completed their briefing on the motion.

### **Factual Background**

The court draws the following facts from the Complaint.  As required on a motion to dismiss, the court accepts these facts as true for the purposes of this opinion.  *Trs. of Upstate N.Y. Eng'rs. Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

Plaintiff Windsor Venture Corp. is in the business of long-haul freight transportation services.  (Doc. 1 ¶ 22.)  Windsor is an asset-based carrier, meaning it owns the tractor-trailers and other vehicles used to transport orders.  (*Id.*)  Windsor, like other asset-based carriers, does not typically contract directly with the supplier (the party shipping the goods).  (*Id.* ¶ 23.)  Instead, the shipper typically works with a trucking broker, also known as a freight broker, that acts as a middleman.  (*Id.*)  The trucking broker contracts with an asset-based carrier, and the carrier then contracts with individual drivers.  (*Id.* ¶¶ 23–24.)

Defendant Agricultural Logistics is a freight broker, and Defendant Agricultural Transport ("AT") is an asset-based carrier company.  (*Id.* ¶¶ 27–28.)  The two companies operate out of the same office.  (*Id.* ¶ 28.)  It is common in the trucking industry for a freight broker and an asset-based carrier "to be closely linked and to handle both broker and carrier services in tandem."  (*Id.* ¶ 29.)  Although AL and AT are separate entities, they operate together under the name "AG Team" and market themselves as a single organization with two separate arms.  (*Id.* ¶ 30.)

In spring 2024, Windsor entered into three separate contracts with AL to transport goods.  (*Id.* ¶ 31.)  The contracts, signed April 1, May 16, and June 5, each specified that payment was due to Windsor 30 days from the date of invoice and that payment was accepted by bank wire.  (*Id.* ¶¶ 32–35.)  Although Windsor fully performed under the contracts, AL did not make any timely payments.  (*Id.* ¶¶ 36–37.)

2

After signing the June contract but before executing the order, Windsor's accounting department noticed the past-due invoice for the April contract and the outstanding payment for the May contract. (*Id.* ¶ 38.) On June 5, 2024, Windsor contacted AL and requested payment for the April contract and emphasized that the May and June invoices needed to be timely paid as well. (*Id.*) The next day, an AL employee, Defendant Matthew Gorka, assured Windsor that AL would pay for the April contract as soon as possible and pay the other invoices on time. (*Id.* ¶ 39.) Later that same day, AL forwarded an electronic check for $1,240. (*Id.* ¶ 40.) Windsor informed Mr. Gorka that the invoice was for $1,580, not $1,240, and that Windsor only accepted payment via wire transfer, as stated in the contract. (*Id.* ¶¶ 41–42.) Mr. Gorka said he would correct the issue. (*Id.* ¶ 42.) To date, AL has not rendered proper payment on the April contract and has not attempted payment of any kind on the May or June contracts. (*Id.* ¶ 43.)

While the discussions of payment were ongoing, Windsor arranged for the fulfillment of the June contract, hiring truck driver Jose Lizardo to deliver the load. (*Id.* ¶¶ 44–45.) Mr. Lizardo picked up the load in Dothan, Alabama on June 5 and began the trip to Tully, New York. (*Id.* ¶ 46.) During the trip, AL contacted Mr. Lizardo by phone several times, even though the carrier, not the freight broker, is usually the one to communicate with the driver. (*Id.* ¶ 47.) On June 7, the day of the delivery, AL contacted Mr. Lizardo and directed him to deliver the load to a different address than that listed on the June contract. (*Id.* ¶ 48.) The new address was approximately ten minutes from the original address. (*Id.*) Mr. Lizardo delivered the load to the new address, and AL received a delivery confirmation for the load. (*Id.* ¶ 49.)

AL's nonpayment and its unusual behavior during the June order prompted Windsor to verify the legitimacy of the order. (*Id.* ¶¶ 51–52.) Windsor contacted the supplier, Nutcracker Brands, Inc. ("Nutcracker"), to ask about the order. (*Id.* ¶ 51.) Nutcracker reported that it had

3

paid AL and that it believed the load was being transported by AT. (*Id.* ¶ 53.) Windsor concluded that AL had contracted with Nutcracker and fraudulently claimed that AT would be transporting the load. (*Id.* ¶ 55.) Windsor further concluded that AL had never intended to pay for the services Windsor rendered, instead using its representation that AT carried the load to retain the payment.[1] (*Id.* ¶¶ 56–57.)

On June 6, the day before the delivery of the June order, defendant Gorka reached out to Windsor and stated that he had tried to stop payment on the electronic check for the April order, having learned that Windsor did not accept electronic checks. (*Id.* ¶ 60.) Gorka claimed that he could not stop payment because the check had already been cashed at a gas station. (*Id.*) Gorka further stated that he had contacted the Miami Police Department to file a theft report. (*Id.* ¶ 61.) Gorka refused to provide information about the alleged investigation, including the investigating officer's name or the case number. (*Id.* ¶ 63.) Plaintiffs believe that AL and Gorka fabricated the theft to avoiding making payment on the April, May, and June orders and that AL had not actually made a police report.

Starting on June 10, 2024, Defendants began making false statements about Windsor and its owner, Luis Lopez, on two trucking industry review and monitoring websites, Carrier411 and TIA Watchdog. (*Id.* ¶ 67.) These posts were made by defendant Gorka and defendant Jacob Sam, the President of both AL and AT. (*Id.* ¶ 72.) They also posted comments regarding other, unrelated businesses that Mr. Lopez owned (the other Plaintiffs in this case), including businesses that were no longer operational. (*Id.* ¶¶ 90–94.) In total, defendants Gorka and Sam posted 11 reviews between June 10 and June 14. (*Id.* ¶¶ 102–103.) Ten of those reviews

---

[1] Plaintiffs refer to this practice as "double brokering." As discussed below, the parties disagree about the definition of that term.

4

contained the same false accusations, and the other review was substantially similar. (*Id.* ¶ 103.) The posts made the following false statements:

- Windsor had failed to show up for jobs without calling ahead of time;

- Windsor engaged in theft or unjustified loss of freight;

- Windsor had repeated pickup or delivery service failures;

- Windsor generally engaged in fraudulent activity and unethical or deceptive business practices;

- After Windsor's driver picked up the June load, Windsor became unresponsive, and the load never arrived;

- Windsor had unilaterally effected an "in-transit agreement modification" during the June order;

- Mr. Lopez was "hiding behind Gmail accounts, family members and false identities" and that any attempts to communicate with him or Windsor had been "met with mockery and harassment";

- Windsor and Mr. Lopez were under investigation for felony theft of an electronic check and for holding a trucking load hostage with intent to sell;

- Mr. Lopez had multiple tractor-trailers involved in a fraudulent scheme to hold loads and containers hostage for additional pay; and

- Mr. Lopez and the tractor-trailers involved in the scheme would switch companies whenever they got reported.

(*Id.* ¶¶ 73–74, 83–85.) The reviews claimed that AL had recorded conversations with Windsor as proof of its allegations. (*Id.* ¶ 84.) This lawsuit ensued.

## Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff "must plead enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 78 (2d Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In evaluating a Rule 12(b)(6) motion, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Trs. of Upstate N.Y. Eng'rs*, 848 F.3d at 566) (internal quotation marks omitted). "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019) (alteration in original) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)).

## Analysis

Defendants' Partial Motion to Dismiss seeks dismissal of all Plaintiffs' federal claims (Counts II, III, and IV) and their New York law claim for unfair competition (Count VI). The court addresses these issues in turn.

## I.    "Double Brokering" Under 49 U.S.C. § 14916 (Count II)

Count II of the Complaint alleges that Defendants engaged in unlawful brokerage activities in violation of 49 U.S.C. § 14916(a). Specifically, Plaintiffs claim that Defendants engaged in a practice known as "double brokering," which, in Plaintiffs' view, refers to the practice of (1) hiring one asset carrier to deliver a load of goods; (2) informing the supplier that a *different* asset carrier will be delivering the goods; and (3) using the false statement to the supplier to justify paying the second asset carrier (the one that did not actually deliver the goods) for the delivery services. (*See* Doc. 1 ¶¶ 124–129.) Defendants seek dismissal of this count,

6

arguing that "double brokering" refers to an entirely different practice than that described by Plaintiffs and that 49 U.S.C. § 14916 does not provide a private cause of action for the conduct alleged in the Complaint.

As an initial matter, Defendants are correct that "double brokering" refers to conduct not alleged in this case. The term generally describes a version of sub-contracting. The case law addressing double brokering defines it as "the practice of a broker receiving a shipment from a shipper and subsequently tendering the shipment to another broker for movement by a motor carrier." *Milliam v. N. Freight, LLC*, No. 20-cv-797, 2023 WL 423114, at *3 (S.D. Ill. Jan. 26, 2023); *see also Reliable Truckload & Brokerage LLC v. Staar Logistics, LLC*, No. 23-cv-1293, 2025 WL 2855839, at *6 (N.D. Ohio Oct. 8, 2025). Double brokering "is frequently done without the shipper's knowledge or the motor carrier's knowledge." *Milliam*, 2023 WL 423114, at *3. Other cases have defined it slightly differently, as the practice of a *carrier* accepting a load then "turn[ing] around and broker[ing] it to somebody else." *Crouch v. Taylor Logistics Co.*, 563 F. Supp. 3d 868, 874 (S.D. Ill. 2021). Either way, the practice does not describe the diversion of payment to a carrier that did not transport the load.

Turning to the statute itself, 49 U.S.C. § 14916 provides, in relevant part, as follows: "A person may provide interstate brokerage services as a broker only if that person (1) is registered under, and in compliance with, section 13904; and (2) has satisfied the financial security requirements under section 13906." 49 U.S.C. § 14916(a). In turn, § 13904 provides:

    (a) **In general.**—The Secretary shall register, subject to section 13906(b), a person to be a broker for transportation of property . . . if the Secretary determines that the person—

        (1) has sufficient experience to qualify the person to act as a broker for transportation; and
        (2) is fit, willing, and able to be a broker for transportation and to comply with this part and applicable regulations of the Secretary.

7

. . .

> (e) **Regulations to protect motor carriers and shippers.**—Regulations of the Secretary applicable to brokers registered under this section shall provide for the protection of motor carriers and shippers by motor vehicle.

*Id.* § 13904(a), (e).

The parties have very different views of the scope of § 14916. In Defendants' view, § 14916(a) "only requires that a party performing freight brokerage services be registered and satisfy certain financial security requirements." (Doc. 11-1 at 7–8.) That is, "[t]he statute does not reach . . . the manner in which a freight broker performs its services." (*Id.* at 8.) Plaintiffs respond that § 14916(a) requires not only registry under but also compliance with § 13904. Plaintiffs posit that, because § 13904 provides for the promulgation of regulations to protect motor carriers and shippers, a broker is noncompliant with § 13904—and, in turn, § 14916(a)— any time it violates a regulation of the Secretary of Transportation. (*See* Doc. 18 at 9.) Finally, Plaintiffs argue that complying with the regulations of the Secretary of Transportation "necessarily includes acting within the ethical boundaries of the industry, and not participating in fraudulent schemes which deceive the carrier or the shipper of products." (*Id.*)

Very few cases discuss the application or scope of §§ 13904 and 14916. Those that do primarily concern whether the defendant was acting as a broker and was therefore covered by the certification requirement. *See, e.g.*, *Kondos v. Cobra Van Lines, LLC*, No. 24-cv-61119, 2024 WL 5264452 (S.D. Fla. Nov. 27, 2024); *Morales v. OK Trans, Inc.*, No. 19-CV-94, 2024 WL 1348405 (S.D. Tex. Mar. 29, 2024). It is not surprising, therefore, that Plaintiffs have not cited, and that the court has not found, any cases supporting Plaintiffs' position or even discussing whether compliance with § 13904 includes complying with the regulations of the Secretary of Transportation. Plaintiffs' attempt to recast §§ 14916 and 13904 as the basis for a

8

private cause of action for enforcing any of the Department of Transportation's regulations fails for three reasons. First, § 13904 calls for the promulgation of regulations, not compliance with those regulations. Second, statutes typically need not specify that regulated parties comply with those regulations; the fact that a regulation exists creates the obligation to comply. Third, Plaintiffs have not pointed to a regulation that Defendants violated, instead arguing that operating outside the ethical boundaries of the industry must be a violation of some regulation of the Secretary of Transportation.

Different courts have consistently interpreted § 14916 to govern licensing requirements. In *Sompo Japan Insurance Co. of America v. B&H Freight, Inc.*, 177 F. Supp. 3d 1084 (N.D. Ill. 2016), the court adopted a narrow reading of § 13904, contrary to Plaintiffs' assertion that complying with the Secretary of Transportation's regulations "necessarily includes acting within the ethical boundaries of the industry, and not participating in fraudulent schemes which deceive the carrier or the shipper of products." (Doc. 18 at 9.) In *Sompo*, the court discussed the scope of Part B of subtitle 4 of Title 49 ("Part B"), which includes § 13904, in the context of federal preemption of state law. Although preemption is clearly not an issue in this case, *Sompo* is helpful insofar as it discusses what conduct is *not* covered by Part B.

As the court in *Sompo* noted, "no provision of Part B prohibits brokers from placing contracts with motor carriers that flout their own registration and insurance obligations (see Sections 13902 and 13906(a)), a sure sign that there was no intention on the part of Congress to define all of a broker's obligations through that statute." *Id.* at 1087 (footnote omitted). The court noted: "And because the content of a broker's duties to its customers primarily impacts such traditional areas of *state* concern such as contract, negligence and perhaps fiduciary responsibility, there is no dominant federal interest in regulating those duties . . . ." *Id.* Though

9

*Sompo* concerned a broker's duties to its customers, the same is true for a broker's duties to the carriers with which it contracts; the issues are primarily of state concern.

The court in *Silva v. West Texas Frac Sand Logistics LLC*, Civ. No. 24-874, 2025 WL 1983581, at \*6 (D.N.M. Jul. 17, 2025), reached a similar conclusion regarding the scope of § 14916:

> Critically, however, the statute's private right of action is limited in scope. By its plain terms, subsection (c) applies only to injuries caused by the unauthorized provision of brokerage services—that is, violations of subsection (a). Nothing in § 14916 creates a general federal cause of action for negligence, nor does it encompass personal injuries resulting from the conduct of motor carriers or brokers. In short, § 14916 is an enforcement statute designed to deter unregistered brokerage activity and ensure compliance with licensing and security requirements. It does not reflect any congressional intent to displace state tort law or to occupy the field of personal injury claims arising from brokered transportation services.

Plaintiffs' claim does not relate to unauthorized brokerage activity. And nothing in §§ 13904 and 14916, the case law, or Plaintiffs' briefing suggests that the statutes at issue cover any unethical conduct in which a broker may engage.

Defendants' Partial Motion to Dismiss is GRANTED with respect to Count II.

## II.    Reverse Passing Off Under the Lanham Act (Count III)

The Complaint next alleges that Defendants violated the Lanham Act by engaging in reverse passing off (also known as reverse palming off). The Lanham Act creates a cause of action for

> any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a). Thus, reverse passing off "under the Lanham Act occurs . . . 'when A sells B's product [or service] under A's name.'" *Societe Des Hotels Meridien, S.A. v. LaSalle Hotel*

10

*Operating P'ship, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994)). Here, Plaintiffs claim that AL engaged in a variation of that conduct: it sold Windsor's service not under AL's own name, but under AT's name.

> To state a claim for reverse passing off, a plaintiff must allege:
>
> (1) that the product at issue originated with the plaintiff; (2) that the origin of the product was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.

*Id.* (cleaned up). Here, Defendants challenge the third and fourth factors. Beginning with the issue of consumer confusion, Defendants contend that Plaintiffs needed to allege actual consumer confusion, not just a likelihood of consumer confusion. The court can quickly dispose of that argument; the case law and the statute both clearly state that reverse passing off occurs when the defendant's actions are "likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A); *Meridien*, 380 F.3d at 131. And Plaintiffs have alleged that AL told Nutcracker that AT, not Windsor, would be transporting the load. That allegation alone is sufficient to support the inference that Nutcracker—the consumer—would have been confused as to the origin of the trucking services. Furthermore, Plaintiffs allege that a Windsor representative called Nutcracker and that Nutcracker stated its belief that AT carried the load, supporting the conclusion that they were confused as to the origin of the services. (Doc. 1 ¶ 53.)

Turning to the issue of harm, Defendants argue that, because Nutcracker was not Windsor's direct customer, "any confusion on the part of [Nutcracker] could not have harmed Windsor." (Doc. 11-1 at 10.) They continue: "There is no indication in the Complaint that [Nutcracker] even knew that Windsor was the carrier who was supposed to transport [Nutcracker's] goods." (*Id.*) This comment undermines rather than supports Defendants'

11

argument. It is precisely the fact that Nutcracker did *not* know that Windsor transported its goods that harmed Windsor. Windsor did not get the benefit of Nutcracker knowing that it was Windsor, not AT, that satisfactorily transported their goods. That knowledge could have engendered good will, positive online reviews, and future opportunities to transport goods for Nutcracker. *See Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 259 (S.D.N.Y. 2000) ("The harm caused by reverse passing off is that the originator of the product is 'involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product.'" (quoting *Rosenfeld v. W.B. Saunders*, 728 F. Supp. 236, 241 (S.D.N.Y. 1990))). Plaintiffs also contend that Windsor did not get paid for its services because of the misrepresentation about who transported the load. (Doc. 1 ¶ 57.) Those allegations are sufficient to support an inference of harm. *See DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 419 (E.D.N.Y. 2021) ("Courts have generally required only minimal showings of harm by a party whose goods are passed off and sold by another." (internal quotation marks and citation omitted)).

The Partial Motion to Dismiss is DENIED with respect to Count III.

## III.    False Advertising (Count IV)

Plaintiffs also bring a claim for false advertising under the Lanham Act, which provides, in relevant part:

> (1) Any person who, or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which—
>
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

12

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  In this case, Plaintiffs challenge the disparaging and allegedly false reviews posted by Defendants.

"To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Zesty Paws LLC v. Nutramax Lab'ys, Inc.*, 157 F.4th 194, 197 (2d Cir. 2025) (quoting *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016)).  Additionally, the false statement must constitute "commercial advertising or promotion," as specified in the statute. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56 (2d Cir. 2002) ("An important issue in this [false advertising] case is whether the allegedly disparaging statements by salespersons at the Fendi Fifth Avenue store constituted 'commercial advertising or promotion' within the meaning of [15 U.S.C. § 1125(a)(1)(B)].").  Defendants challenge Plaintiffs' claim for false advertising on the basis that the negative reviews were not "commercial advertising or promotion."

The "touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique*, 314 F.3d at 57. The Second Circuit has adopted a three-part test for determining whether a statement constitutes "commercial advertising or promotion."  Under that test, the statement must be "(1) 'commercial speech,' (2) made 'for the purpose of influencing consumers to buy defendant's goods or services,' and (3) 'although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant

13

purchasing public.'" *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (per curiam) (citing *Fashion Boutique*, 314 F.3d at 57–58).

Defendants focus their argument on the second factor of this test, contending that the allegedly false reviews were not made for the purpose of influencing consumers to buy Defendants' goods or services. They rely on the fact that the reviews do not mention Defendants or their services and, further, on the fact that the reviews were posted on sites "used by transportation industry professionals to assess the qualifications of motor carriers," not to advertise services. (Doc. 11-1 at 12.) Plaintiffs respond that "false reviews posted to the relevant purchasing public, even if they do not directly promote the defendant in the review, are 'commercial advertising and promotion' for the purposes of a false advertising claim." (Doc. 18 at 14.)

False and disparaging reviews on websites like Carrier411 and TIA Watchdog can constitute "commercial advertising and promotion," but only when those reviews are paired with some attempt to promote the defendant's goods or services. The cases Plaintiffs cite to support their argument are all distinguishable from this case on that basis. For example, in *Beyond 79, LLC v. Express Gold Cash, Inc.*, No. 19-cv-6181, 2020 WL 7352545 (W.D.N.Y. Dec. 15, 2020), the plaintiff alleged that the defendants created websites purporting to be third-party independent review and informational websites reviewing businesses that buy jewelry and gold. Through those websites, the defendants posted false and disparaging statements about the plaintiff's business. *Id.* at *1. At the same time, the websites included posts with "misleading information about [the defendants] that cast them in a positive light." *Id.* The defendants' statements were thus clearly aimed not just at driving customers away from the plaintiff but also driving those

14

customers *to* the defendants.  Without that added element, such statements cannot be "for the purpose of influencing consumers to buy defendant's goods or services."

Several other cases have reached similar conclusions, always hinging on the fact that the defendants pushed consumers toward their own products—or toward those of affiliates. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 355 (S.D.N.Y. 2021) (plaintiff stated false advertising claim where defendant's website placed plaintiff's website on its Not Recommended List as unsafe and illegal and directed consumers to its affiliates with a "Buy safely" list linking to those affiliates); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-cv-442, 2016 WL 815205, at *7 (S.D.N.Y. Feb. 29, 2016) (holding that plaintiff's false advertising claim under the Lanham Act should survive summary judgment where defendant's employees posted false and disparaging online reviews of plaintiff that specifically mentioned the superiority of defendant's services); *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 294 (S.D.N.Y. 2016) (plaintiff had viable false advertising claim where defendant's third-party review website made false and disparaging comments about plaintiff's product while promoting defendant's affiliates as better alternatives); *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1233 (S.D.N.Y. 1991) (plaintiff had valid false advertising claim where former employee called plaintiff's customers, falsely claimed she had to quit because of plaintiff's business improprieties, and told them she would soon start her own competing business).

By contrast, courts have rejected Lanham Act claims where the alleged advertisement or promotion in no way steered consumers to the defendant's goods or services, or to those of the defendant's affiliates.  For instance, in *Wexler v. Dorsey & Whitney, LLP*, No. 18-CV-3066, 2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019), the court dismissed a Lanham Act false advertising

15

claim where the defendant, a competing law firm, wrote an allegedly disparaging article on its blog about the plaintiff, a solo legal practitioner. Though the defendant and plaintiff were direct competitors, the blog post made no mention of the defendant's own legal services or otherwise try to solicit clients. The post was not, therefore, advertising or promotion for the defendant's services, even if it negatively impacted the plaintiff's ability to attract new clients. Other cases have reached the same conclusion. *See, e.g., Edward B. Beharry & Co. v. Bedessee Imps. Inc.,* No. 09-CV-77, 2010 WL 1223590, at *8 (E.D.N.Y. Mar. 23, 2010) (holding that false and disparaging news article was not advertising or promotion for competitor, even though competitor allegedly solicited the article, because the article made no mention of competitor or its products); *Edward Lewis Tobinick, MD v. Novella,* 848 F.3d 935, 950–51 (11th Cir. 2017) (affirming dismissal of Lanham Act claims, concluding that doctor's blog posts critical of another doctor's medical practice and medical treatments were noncommercial speech because of absence of commercial transactions being proposed or products for sale).[2]

Here, Plaintiffs have clearly alleged facts sufficient to support the conclusion that Defendants, though their reviews, sought to damage Plaintiffs' reputations and businesses. But the allegations do not support the conclusion that the purpose of the posts was to influence consumers to buy Defendants' services. In fact, Plaintiffs specifically allege that Defendants posted the reviews "for the sole purpose of harming Plaintiffs' reputations and causing these organizations to lose revenue." (Doc. 1 ¶ 107.) Plaintiffs do not allege that the reviews were

---

[2] The court acknowledges that the cases cited above primarily concern whether the speech at issue constituted "commercial speech," not whether the statements were made "for the purpose of influencing consumers to buy defendant's goods or services"—the issue in this case. Those inquiries, however, overlap considerably. *See PharmacyChecker.com,* 530 F. Supp. 3d at 355 (holding that, for the same reasons that plaintiff successfully alleged that defendant's speech was commercial, plaintiff successfully alleged that the statements were "made for the purpose of influencing consumers to buy defendant's goods or services").

16

meant to advertise or promote Defendants' services.  Rather, reading the Complaint as a whole, the allegations support the inference that Defendants sought to discredit Plaintiffs in order to conceal their own wrongdoing.  The motivation may have been economic, but it was not promotional, even drawing all reasonable inferences in Plaintiffs' favor.  Quite simply, the reviews did not compare the quality of Plaintiffs' services with Defendants' or even mention Defendants' services at all.

Because the allegedly false reviews were not "commercial advertising or promotion," the Partial Motion to Dismiss is GRANTED with respect to Count IV.

## IV.    Unfair Competition (Count VI)

Count VI of the Complaint alleges a state-law unfair-competition claim.  "'The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another with some element of bad faith.'" *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 81 (E.D.N.Y. 2025), *modified in part on reconsideration*, 2025 WL 2178194 (quoting *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022)).  New York law "ha[s] long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476, 850 N.Y.S.2d 366, 880 N.E.2d 852 (2007).  As discussed above, passing off (or palming off) is "the sale of goods of one manufacturer as those of another." *Id.*  To establish the passing off theory of unfair competition, "the plaintiff m[u]st prove (1) either actual confusion or a likelihood of confusion [as to the origin of the good]; and (2) bad faith on the part of the defendant." *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 444 (S.D.N.Y. 2011) (second alteration in original) (quoting *SLY Mag., LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 442–43 (S.D.N.Y. 2007)).

17

Defendants contend that this claim "fails for the same reason [that Plaintiffs'] reverse passing off claim under the Lanham Act fails: Plaintiffs fail to allege that Defendants' conduct will result in any consumer confusion." (Doc. 11-1 at 13.)  For the same reasons articulated in Part II of this order, Plaintiffs have adequately alleged consumer confusion.

The Partial Motion to Dismiss is DENIED with respect to Count VI.

## Conclusion

The Partial Motion to Dismiss (Doc. 11) is GRANTED in part and DENIED in part.  The motion is granted with respect to Counts II and IV of the Complaint.  The motion is otherwise denied.

Dated this 9th day of February, 2026.

Geoffrey W. Crawford, Judge
United States District Court

18